UNITED STATES, Appellee,

v.

Daniel A. GENDRON, Defendant,
Appellant.

No. 92–2003.

United States Court of Appeals,
First Circuit.

Heard Oct. 6, 1993.

Decided Feb. 28, 1994.

Jonathan S. Sales, by Appointment of the Court, with whom The Law Office of William P. Homans, Jr., Cambridge, MA, was on brief, for appellant.

Robert E. Richardson, with whom A. John Pappalardo, United States Attorney, and James F. Lang, Assistant United States Attorney, Boston, MA, were on brief, for appellee.

Before BREYER, Chief Judge, BOUDIN, Circuit Judge, POLLAK,* Senior District Judge.

BREYER, Chief Judge.

Daniel Gendron ordered and received a videotape that contained child pornography. Though he did not know it, the firm that sent him the tape was part of a law enforcement operation designed to catch child pornography buyers. A jury subsequently convicted Gendron of knowingly receiving child pornography through the mails. 18 U.S.C. § 2252(a)(2). He now appeals that conviction, claiming that the child pornography statute is unconstitutional, that the government unlawfully entrapped him, and that the government's search warrant (for the tape in his house) was constitutionally defective. After considering these and other related claims, we affirm the conviction.

## I

*The Statute's Constitutionality*

■ The child pornography statute reads as follows:

(a) *Any person who—*

. . . . .

(2) *knowingly receives,* or distributes, *any visual depiction that has been mailed,* or has been shipped or transported *in interstate* or foreign *commerce,* or which contains materials which have been mailed or so shipped or transported, by any means including by computer, or knowingly reproduces any visual depiction for distribution in interstate or foreign commerce by any means including by computer or through the mails, *if—*

(A) *the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and*

(B) *such visual depiction is of such conduct;*

. . . . .

*shall be punished* as provided in subsection (b). . . .

18 U.S.C. § 2252(a)(2) (emphasis added). Gendron points out that the Ninth Circuit has interpreted this statute as permitting a conviction of a person who *does not know* the child-pornographic *nature* of the material received, and, for that reason, has found it unconstitutional. *See United States v. X-Citement Video,* 982 F.2d 1285 (9th Cir.1992), *cert. granted,* —— U.S. ——, 114 S.Ct. 1186, 127 L.Ed.2d 536 (1994). He says we should do the same.

The Ninth Circuit, in *United States v. Thomas,* 893 F.2d 1066 (9th Cir.), *cert. denied,* 498 U.S. 826, 111 S.Ct. 80, 112 L.Ed.2d

* Of the Eastern District of Pennsylvania, sitting by designation.

53 (1990), considered the scope of the statute's word "knowingly." It held that "knowingly" modifies only the statute's word "receives" (or "reproduces"), not its subclause (A) or (B). Consequently, it "does not require" that a defendant "knew that the pornography he ... received involved a minor." *Id.* at 1070. Two years later, in *X–Citement Video,* the Ninth Circuit pointed out that the statute, as so interpreted, would permit conviction of a person who "knowingly receives" a video, but *does not know* that the video contains child pornography. Because that interpretation would permit conviction of a person with an innocent state of mind, the court found the statute unconstitutional. *X–Citement Video,* 982 F.2d at 1292; *see New York v. Ferber,* 458 U.S. 747, 765, 102 S.Ct. 3348, 3359, 73 L.Ed.2d 1113 (1982) (child pornography statutes must involve "some element of scienter" to pass constitutional muster).

We do not accept the Ninth Circuit's conclusion that the statute is unconstitutional, however, because we do not agree with the statutory premise set forth in *Thomas.* In our view, and in the view of all courts to have considered the matter since the *X–Citement Video* decision, *see United States v. Cochran,* 17 F.3d 56 (3d Cir.1994); *United States v. Edwards,* No. 92–CR–884, 1993 WL 453461 (N.D.Ill. Nov. 4, 1993); *United States v. Long,* 831 F.Supp. 582 (W.D.Ky.1993); *United States v. Kempton,* 826 F.Supp. 386 (D.Kan.1993); *United States v. Prytz,* 822 F.Supp. 311 (D.S.C.1993), the statute's word "knowingly" modifies not only the word "receives," but also the statute's description of the "receive[d]" material's pornographic content. That is to say, we understand the statute to require for conviction that the government prove not only that the defendant "knowingly receive[d]" material that he knows contains a "visual depiction" of a person "engaging in sexually explicit conduct," but also that the defendant knows that the person so depicted is a minor. *Accord Edwards,* 1993 WL 453461 at *5; *Long,* 831 F.Supp. at 586; *Kempton,* 826 F.Supp. at 389; *Prytz,* 822 F.Supp. at 321.

We concede that one cannot know automatically, *simply from the position of the words in the sentence,* just which of the words following "knowingly" the word "knowingly" is meant to modify. However, that linguistic fact simply reflects the more basic fact that statements, and parts of statements, quite often derive their meaning from context. The sentence "John knows that people speak Spanish in Tegucigalpa, which is the capital of Honduras," taken by itself, leaves us uncertain whether or not John knows that Tegucigalpa is the capital of Honduras; but, the context of the story in which the sentence appears, a context that includes other sentences, may clear up our uncertainty and leave us with no doubt at all.

Similarly, when courts interpret criminal statutes, they draw upon context, including the statute's purpose and various background legal principles, to determine which states of mind accompany which particular elements of the offense. Thus, courts normally hold that the prosecutor need not prove the defendant's state of mind in respect to "jurisdictional facts" (for example, that an assault victim was a *federal* officer, or that stolen checks moved *in the mail*), whatever the mental state required for the crime's other elements. *E.g., United States v. Feola,* 420 U.S. 671, 676–86, 95 S.Ct. 1255, 1259–64, 43 L.Ed.2d 541 (1975); *Barnes v. United States,* 412 U.S. 837, 847, 93 S.Ct. 2357, 2363, 37 L.Ed.2d 380 (1973); *United States v. Blassingame,* 427 F.2d 329, 330 (2d Cir.1970), *cert. denied,* 402 U.S. 945, 91 S.Ct. 1629, 29 L.Ed.2d 114 (1971); *see generally* S.Rep. No. 307, 97th Cong., 1st Sess. 72–74 (1981). Context (what ordinarily counts as bad behavior; the reason why Congress mentions jurisdictional facts; etc.), in addition to the position of words in a sentence, helps a court decide how, and when, to interpret statutes as incorporating states of mind. *See, e.g., Blassingame,* 427 F.2d at 330.

The background context here includes the fact that, when a criminal statute is totally silent about state of mind (as is commonly the case), courts nonetheless assume that Congress intended to require some kind of guilty knowledge with respect to major wrong-creating elements of major crimes. *Liparota v. United States,* 471 U.S. 419, 426, 105 S.Ct. 2084, 2088, 85 L.Ed.2d 434 (1985) (courts should not read criminal statutes as

"requiring no *mens rea*"); *United States v. United States Gypsum Co.,* 438 U.S. 422, 438, 98 S.Ct. 2864, 2874, 57 L.Ed.2d 854 (1978) (in criminal statutes, "far more than the simple omission of the appropriate phrase from the statutory definition is necessary to justify dispensing with an intent requirement"); *Morissette v. United States,* 342 U.S. 246, 255–56, 263, 72 S.Ct. 240, 246, 249, 96 L.Ed. 288 (1952).

Thus, had the word "knowingly" not appeared at all in the child pornography statute, courts (while not insisting upon "knowledge" of the "interstate commerce" element of the offense, *see supra* p. 958) would have insisted nonetheless that prosecutors prove a guilty state of mind in respect to the nature of the material. For one thing, the fact that the material shows a child engaging in sexually explicit activity is not a secondary, or jurisdictional, aspect of the crime. It is the moral and criminal heart of the matter. For another thing, without such a requirement, the statute would severely punish purely innocent conduct. It would reach, for example, a post office employee who "knowingly distributes" mail but knows nothing of its contents, or a film developer who for some reason returns an undeveloped roll of film to a customer. Congress could not have intended these results. Pp. 959–960, *infra; see United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981) (courts must construe statutes to avoid absurd results); *United States v. Ferryman,* 897 F.2d 584, 589 (1st Cir.1990) (same). Finally, as *X–Citement Video* itself demonstrates, to read this criminal statute as "requiring no *mens rea*" (contrary to *Liparota,* 471 U.S. at 426, 105 S.Ct. at 2088) likely makes it unconstitutional. *See New York v. Ferber,* 458 U.S. 747, 765, 102 S.Ct. 3348, 3359, 73 L.Ed.2d 1113 (1982) (criminalization of child pornography must involve "some element of scienter on the part of the defendant"); *see also Osborne v. Ohio,* 495 U.S. 103, 113 n. 9, 115, 110 S.Ct. 1691, 1698 n. 9, 1699, 109 L.Ed.2d 98 (1990) (same; "recklessness" suffices). Such an interpretation therefore violates courts' duty to interpret federal statutes so that they are consistent with the federal Constitution whenever possible. *E.g., Edward J. DeBartolo Corp. v.*

*Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988).

If we would interpret a *silent* statute as imposing a guilty state of mind requirement, how could Congress's explicit use of the word "knowingly" eliminate it? It seems far more likely that Congress used the word "knowingly" to make clear that it *did* intend to insist that a defendant know the child-pornographic nature of the material. The legislative history confirms this view. For example, Senator Roth, the author of the amendment which extended the original bill to distribution as well as production, was asked whether the amendment meant that

> the distributor or seller must have [either] actual knowledge that the materials do contain child pornographic depictions, or [that] he should have had such actual knowledge.

He responded:

> That is absolutely correct. This amendment, limited as it is by the phrase "knowingly," insures that *only* those sellers and distributors who are *consciously and deliberately engaged in the marketing of child pornography* and thereby are actively contributing to the maintenance of this form of child abuse are subject to prosecution under this amendment.

123 Cong.Rec. 33,050 (1977) (emphasis added). The language to which Senator Roth referred found its way into the final law (with minor stylistic changes). *Compare* 123 Cong.Rec. 33,061 (1977) (Senate bill with Roth amendment) *with* Pub.L. No. 95–225, § 2(a), 92 Stat. 7, 7–8 (1978) (final version).

Furthermore, the Department of Justice wrote Congress a letter in which it told Congress that the

> use of the word "knowingly" in subsection 2252(a)(1) is appropriate to make it clear that *the bill does not apply to ... innocent transporters who have no knowledge of the nature or character of the material they are transporting.*

S.Rep. No. 438, 95th Cong., 2d Sess. 29 (1978), *reprinted in* 1978 U.S.C.C.A.N. 40, 64 (emphasis added) [hereinafter "Report"]. Thus, the Department and the amendment's

author agreed that the point of the statute's explicit use of the word "knowingly" lies in the application of that word to the nature of the material's *contents,* not to the nature of its distribution or receipt.

It is true that the Department also said, in a different context,

> We assume that it was *not the intention* of the drafters to require the Government *to prove* that *the defendant knew the child was under age sixteen* but merely to prove that the child was, in fact, less than age sixteen.

*Id.,* 1978 U.S.C.C.A.N. at 64 (emphasis added). In saying this, however, the Department was referring to a *different* statutory provision—one that penalized *production,* not distribution. And Congress responded by dropping the word "knowingly" from the production section of the statute, but *not* from the distribution section. H.R.Conf.Rep. No. 811, 95th Cong., 2d Sess. 5, *reprinted in* 1978 U.S.C.C.A.N. 69, 69; *compare* Pub.L. No. 95–225, § 2251(a), 92 Stat. 7, 7 (1978) (knowledge not required in production prosecution) *with id.* § 2252(a), 92 Stat. at 7–8 (knowledge required in distribution or receipt prosecution).

Finally, we concede that at one point the Department's letter suggests that there be no knowledge requirement with respect to age, even for distribution prosecutions. It said,

> To clarify the situation, the legislative history might reflect that the defendant's *knowledge of the age of the child is not an element* of the offense, but that the bill is *not intended to apply* to innocent transportation with *no knowledge of the nature or character* of the material involved.

Report, *supra,* at 29, 1978 U.S.C.C.A.N. at 64 (emphasis added). We have found nothing in the statute or the legislative history, however, to suggest that Congress adopted this recommendation. To the contrary, the legislative history reveals congressional awareness of the important constitutional differences between adult and child pornography, the likely constitutional significance of age, and the concomitant constitutional need for a guilty state of mind requirement with respect to age. *See, e.g.,* 123 Cong.Rec. 33,048 (1977)

(statement of Sen. Goldwater); *id.* at 33,051 (statement of Sen. Hatch). In light of this background, we conclude that the statute's word "knowingly" applies to age as well as to conduct. That being so, we find no constitutional obstacle to application of the statute in the case before us. (We note that while this opinion was circulating in draft form among the members of this panel, another panel of this court reached the same conclusion. *See United States v. Gifford,* 17 F.3d 462, 471–73 (1st Cir.1994).)

## II

### *Entrapment*

The evidence in this case demonstrated rather convincingly that Gendron ordered and received a videotape that he knew contained child pornography. Consequently, Gendron's strongest evidence-based claim does not deny his having engaged in conduct that violates the statute. Rather, he argues that the evidence shows the government "entrapped" him into doing so. Gendron notes that the entrapment defense has two parts: (1) the government's "inducement" of criminal behavior; (2) by a defendant who was not "predisposed" to commit the crime. *See, e.g., United States v. Rodriguez,* 858 F.2d 809, 812–15 (1st Cir.1988) (setting forth elements of entrapment and relevant evidentiary burdens). Although the court submitted the entrapment issue to the jury, which found against Gendron, he argues that the evidence did not support the jury's verdict. He says that it did not allow the government to rebut his claim of "inducement," nor was it sufficient to show (beyond a reasonable doubt) his "predisposition" to commit the crime. Consequently, he says, particularly in light of a recent Supreme Court case that accepted rather similar arguments, *Jacobson v. United States,* —— U.S. ——, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992), the law requires a judgment of acquittal.

It may help in evaluating Gendron's argument if we set forth in simplified terms our understanding of the entrapment defense and its elements. (For more comprehensive accounts, see, e.g., *Rodriguez, supra;* S.Rep.

No. 307, 97th Cong., 1st Sess. 118–30 (1981); LaFave & Scott, Substantive Criminal Law § 5.2 (1986); Louis M. Seidman, *The Supreme Court, Entrapment, and Our Criminal Justice Dilemma,* 1981 Sup.Ct.Rev. 111.) The Supreme Court has described that defense as resting upon an assumption that Congress, when enacting criminal statutes, does not intend the statute to apply to violations arising out of (1) the government's *"abuse"* of its crime "detection" and law "enforcement" efforts by "instigati[ng]" the criminal behavior and "lur[ing]" to commit the crime (2) persons who are *"otherwise innocent."* *Sorrells v. United States,* 287 U.S. 435, 448, 53 S.Ct. 210, 215, 77 L.Ed. 413 (1932) (emphasis added). Consequently, the entrapment doctrine forbids punishment of an *"otherwise innocent"* person whose "alleged offense" is "the *product of the creative activity"* of government officials. *Id.* at 451, 53 S.Ct. at 215 (emphasis added). As the Supreme Court has recently stated,

> When the Government's quest for conviction leads to the apprehension of an *otherwise law-abiding citizen* who, *if left to his own devices,* likely would have never run afoul of the law, the courts should intervene.

*Jacobson,* —— U.S. at ——, 112 S.Ct. at 1543 (emphasis added). Since the Court has repeatedly expressed concern about *both* government "abuse" of its enforcement powers (or the like) *and* the "otherwise law-abiding citizen" (or the like), it is not surprising that the defense has two parts, one that focuses upon government "inducement" and the other upon the defendant's "predisposition."

■ In describing "inducement," courts have distinguished between proper and improper law enforcement activities. It is proper (i.e., not an "inducement") for the government to use a "sting," at least where it amounts to providing a defendant with an "opportunity" to commit a crime. *E.g., Sorrells,* 287 U.S. at 441, 53 S.Ct. at 212; *Sherman v. United States,* 356 U.S. 369, 372, 78 S.Ct. 819, 820, 2 L.Ed.2d 848 (1958); *United States v. Coady,* 809 F.2d 119, 122 (1st Cir. 1987); *United States v. Espinal,* 757 F.2d 423, 425 (1st Cir.1985). Without this kind of law enforcement weapon, it would often prove difficult, or impossible, to stop certain seriously criminal activity, particularly activity involving drugs, or corruption, or other crimes in which no direct participant wants the crime detected. *See Hampton v. United States,* 425 U.S. 484, 495 n. 7, 96 S.Ct. 1646, 1653 n. 7, 48 L.Ed.2d 113 (1976) (Powell, J., concurring in judgment); *United States v. Bradley,* 820 F.2d 3, 6 (1st Cir.1987).

■ An improper "inducement," however, goes beyond providing an ordinary "opportunity to commit a crime." *Jacobson,* —— U.S. at ——, 112 S.Ct. at 1541. An "inducement" consists of an "opportunity" *plus* something else—typically, excessive pressure by the government upon the defendant or the government's taking advantage of an alternative, non-criminal type of motive. A "sting" that combines an ordinary opportunity with these extra elements runs the risk of catching in the law enforcement net not only those who might well have committed the crime elsewhere (in the absence of the sting), but also those who (in its absence) likely would never have done so. Insofar as the net catches the latter, it stretches beyond its basic law enforcement purpose.

Some examples of improper "inducement" may help. Courts have found a basis for sending the entrapment issue to the jury (or finding entrapment established as a matter of law) where government officials: (1) used "intimidation" and "threats" against a defendant's family, *United States v. Becerra,* 992 F.2d 960, 963 (9th Cir.1993); (2) called every day, "began threatening" the defendant, and were belligerent, *United States v. Groll,* 992 F.2d 755, 759 (7th Cir.1993); (3) engaged in "forceful" solicitation and "dogged insistence until [defendant] capitulated," *Rodriguez,* 858 F.2d at 815; (4) played upon defendant's sympathy for informant's common narcotics experience and withdrawal symptoms, *Sherman,* 356 U.S. at 373, 78 S.Ct. at 821; (5) played upon sentiment of "one former war buddy ... for another" to get liquor (during prohibition), *Sorrells,* 287 U.S. at 440–41, 53 S.Ct. at 212; (6) used "repeated suggestions" which succeeded only when defendant had lost his job and needed money for his family's food and rent, *United States v. Kessee,* 992 F.2d 1001, 1003 (9th Cir.1993); (7) told

defendant that she (the agent) was suicidal and in desperate need of money, *United States v. Sullivan*, 919 F.2d 1403, 1419 & n. 21 (10th Cir.1990). The background and context of each example illustrate possible government "overreaching"—of its having acted unfairly by employing

> methods of persuasion or inducement which create a substantial risk that such an offense will be committed by persons other than those who are ready to commit it.

Model Penal Code § 2.13(1)(b).

■ The second part of the entrapment defense, "predisposition," is somewhat more difficult to understand. Some Supreme Court Justices (and the Model Penal Code's authors) have argued that "predisposition" is not even relevant. Rather, they thought that the defense should focus only upon government impropriety, preventing law enforcement officers from using methods that might lead ordinary law-abiding citizens astray, whether or not the particular defendant was "predisposed" to commit the crime. *See, e.g.,* Model Penal Code § 2.13; *Sorrells*, 287 U.S. at 453, 53 S.Ct. at 217 (Roberts, J., joined by Brandeis & Stone, JJ., concurring) (arguing for this "objective" view of the defense); *Sherman*, 356 U.S. at 378, 78 S.Ct. at 823 (Frankfurter, J., joined by Douglas, Harlan & Brennan, JJ., concurring) (same). The Supreme Court itself, however, has rejected this view. It saw in the entrapment defense not so much a sanction used to control police conduct, but rather a protection of the ordinary law-abiding citizen against government overreaching. Consequently, it saw no need to permit a defendant to take advantage of that defense unless he himself was such a citizen. *See, e.g., Sorrells*, 287 U.S. at 448, 53 S.Ct. at 215; *Sherman*, 356 U.S. at 376–77, 78 S.Ct. at 823; *United States v. Russell*, 411 U.S. 423, 433–35, 93 S.Ct. 1637, 1643–44, 36 L.Ed.2d 366 (1973). The upshot is that we must find out just who that "innocent person" is. Who is the *otherwise* law-abiding citizen" who would not "otherwise" have committed the crime?

The question's difficulty lies in the word "otherwise." That word requires us to abstract from present circumstances. We cannot simply ask whether, without the government's present activity, the defendant would likely have committed the crime *when* he did. After all, without the government's having presented *that* opportunity, the defendant, no matter how "predisposed," would likely not have acted *then*. Nor can we simply ask whether the defendant would have acted similarly at some other time *had he faced similar circumstances*, since his present behavior virtually compels an affirmative answer to the question phrased in this way.

The right way to ask the question, it seems to us, is to abstract from—to assume away— the present circumstances *insofar as they reveal government overreaching*. That is to say, we should ask how the defendant likely would have reacted to an *ordinary* opportunity to commit the crime. *See Jacobson*, —— U.S. at ——, n. 2, 112 S.Ct. at 1540 n. 2. By using the word "ordinary," we mean an opportunity that lacked those special features of the government's conduct that made of it an "inducement," or an "overreaching." Was the defendant "predisposed" to respond affirmatively to a *proper*, not to an *improper*, lure?

This way of looking at the matter seems to flow from the way in which the Supreme Court has resolved the clash between "objective" and "subjective" views of entrapment— at least if one looks at that resolution as simply denying the defense to one whom it is not designed to help, namely the kind of defendant who (without a "sting") might well be out committing crimes of the sort that a "sting" seeks to stop. *See Russell*, 411 U.S. at 434, 93 S.Ct. at 1644. Further, our effort to define "predisposition" through reference to the nature of the government conduct reflects the fact that, despite partial descriptions that focus primarily upon the defendant's state of mind, *government* misconduct lies at the heart of the entrapment defense. Were that not so—were the issue simply the defendant's state of mind—the law would permit an innocent minded defendant to raise an entrapment claim when a *private* person "induced" him (through similar "overreaching" conduct) to commit a crime. But the law does not authorize the defense in those circumstances, however "outrageous"

the private person's conduct. *E.g., Russell,* 411 U.S. at 433, 93 S.Ct. at 1643; *United States v. Jones,* 950 F.2d 1309 (7th Cir.1991); *United States v. Bradley,* 820 F.2d 3, 6 (1st Cir.1987); *United States v. Emmert,* 829 F.2d 805 (9th Cir.1987); *United States v. McLernon,* 746 F.2d 1098 (6th Cir.1984); *Whiting v. United States,* 321 F.2d 72, 76 (1st Cir.1963).

Finally, this way of phrasing the question prevents one from concluding automatically, simply from the fact that the defendant committed the crime, that he was "predisposed" to commit it. At the same time, if the answer to the question so phrased is affirmative, the defendant would seem to be the sort of person (and his conduct in this instance is the sort of conduct) that the criminal statute intends to punish. He is, in other words, someone who would likely commit the crime under the circumstances and for the reasons normally associated with that crime, and who therefore poses the sort of threat to society that the statute seeks to control, and which the government, through the "sting," seeks to stop.

We turn now to *Jacobson v. United States,* the recent child pornography case where the Supreme Court found entrapment as a matter of law, and upon which Gendron heavily relies. Government agents found Jacobson's name on a bookstore mailing list that indicated that the store had mailed photos of naked children to Jacobson. Government agents then sent Jacobson letters from fictitious people and organizations, soliciting orders for child pornography. In three respects, however, they did more than provide an ordinary opportunity to buy child pornography: First, the solicitations reflected a psychologically "graduated" set of responses to Jacobson's own noncriminal responses, beginning with innocent lures and progressing to frank offers. The government started with a "sexual attitude questionnaire," which elicited a general interest in "pre-teen sex"; it followed with letters containing general, nonexplicit references implying a possibility of child pornography; it then sent Jacobson more personal correspondence; and, finally (but after Jacobson had discontinued the correspondence), it sent him child pornography cata-

logues. —— U.S. at ——-——, 112 S.Ct. at 1538–39. Second, the government's soliciting letters sometimes depicted their senders as "free speech" lobbying organizations and fighters for the "right to read what we desire"; they asked Jacobson to "fight against censorship and the infringement of individual rights." *Id.* at ——, 112 S.Ct. at 1538, 1542. Third, the government's effort to provide an "opportunity" to buy child pornography stretched out over two and a half years. Taken together, one might find in these three sets of circumstances—the graduated response, the long time period, the appeal to a proper (free speech) motive—a substantial risk of inducing an ordinary law-abiding person to commit the crime. Indeed, the government conceded in *Jacobson* that its methods amounted, for entrapment purposes, to an improper "inducement." *Id.* at —— n. 2, 112 S.Ct. at 1540 n. 2.

*Jacobson's* importance, however, concerns the "predisposition" part of the entrapment defense. The Court held that the evidence, as a matter of law, required acquittal because a reasonable jury would have had to doubt Jacobson's predisposition. The evidence of predisposition consisted of two facts: (1) that before the government became involved Jacobson was on a private bookstore's mailing list for dubious photos; and (2) that he responded affirmatively to the government's solicitations. The first fact, the Court wrote, showed little about a predisposition to act *un*lawfully because ordering the photos was lawful at the time. —— U.S. at ——, 112 S.Ct. at 1542. The second, placing orders, could not show how Jacobson would have acted had the solicitation lacked the three elements we just mentioned, namely, the improper appeals to anti-censorship motives, the graduated response, and the lengthy time frame. *Id.* at ——, 112 S.Ct. at 1542–43. The government therefore failed to show "predisposition" (beyond a reasonable doubt). That means (as we understand it) that the government's evidence did not show how Jacobson would have acted had he been faced with an ordinary "opportunity" to commit the crime rather than a special "inducement."

■ Gendron's case is similar to Jacobson's in two respects. The government ini-

tially found Gendron's name on a "naked children" mailing list, and the government sent him child pornography solicitations over a fairly long period of time (one of the "sham" companies was also involved in *Jacobson*). There are, however, two critical differences.

■ First, any governmental "over-reaching" here was less extensive than in *Jacobson*. The government neither "graduated" its responses (from innocent lure to frank offer) nor, with one exception, did it appeal to any motive other than the desire to see child pornography. The exception consists of one solicitation (also present in *Jacobson*) in which the government's sham company referred to "hysterical nonsense" about pornography, and asked why the government was "spending millions of dollars to exercise international censorship while tons of drugs" enter the country "easily." Nonetheless, here the government did not disguise itself as a "sexual rights" lobbying organization, seeking to lobby Congress to remove restraints and funding its efforts through pornographic catalogue sales. Nor did the government ask Gendron to commit the crime as a matter of principle. *See* ―― U.S. at ――-――, ――, 112 S.Ct. at 1538–39, 1542. Since the "overreaching" here was far less extensive than in *Jacobson*, there is less reason to believe that government "over-reaching" (i.e., an improper "inducement") could lead an "otherwise innocent" person to commit the crime. *See Gifford*, 17 F.3d at 469–70.

Second, the record contains substantial evidence of Gendron's state of mind; that evidence permits the conclusion that (inducement or not) he was "predisposed" to commit the crime. In late 1986, when Gendron first received a verbally explicit "child pornography" catalogue from the government's sham company, he placed an order accompanied by a letter in which he said,

> I have finally found the kind of educational material I've been dreaming of possessing for quite some time. I ... [am so] excited that I have decided to order two of your titles....

The government did not fill the order, but three years later Gendron responded to a letter from another sham, a pretend foreign company, which spoke of "hard to obtain erotica." He wrote,

> I am very interested in the other part of your services that are very difficult to obtain in my country.... I am becoming very bored with adult pornography.... I like very young girls only and color videos. Can you help me.

The sham firm responded with an explicit child pornography catalogue, and Gendron ordered several of the titles. (Again the government did not fill the order.) A few months later the government sent Gendron a third explicit child pornography catalogue. Gendron sent back an order and a check. Two months later, he wrote again, asking if the firm had "forgotten" his order, making clear that he still wanted "this type of educational materials," stating, "don't worry, I am not connected in any way with law enforcement," and adding "Please Hurry." (This time the government filled the order with the video that led to this prosecution.) Unlike Jacobson's correspondence, Gendron's correspondence reveals only a desire to view child pornography; it contains nothing like Jacobson's urging of a "counter attack" against those "who are determined to curtail our freedoms." ―― U.S. at ――, 112 S.Ct. at 1538. (See Appendix for a detailed chronology of the events in Gendron's case.)

This evidence, taken together, reveals a defendant who met an initial opportunity to buy child pornography with enthusiasm, who responded to each further government initiative with a purchase order, and who, unlike Jacobson, showed no particular interest in an anti-censorship campaign. This evidence, as we have said, permits a jury to find (beyond a reasonable doubt) that Gendron would have responded affirmatively to the most ordinary of opportunities, and, hence, was "predisposed" to commit the crime. We therefore find the jury's entrapment decision lawful.

### III

#### *Search and Seizure*

Government agents searched Gendron's house, and seized the primary piece of evi-

dence (the videotape), pursuant to a warrant. That warrant authorized (1) a search of

the residence of Daniel A. Gendron, 105 Winthrop Street, Rehoboth, Massachusetts 02769;

for (2) a "VHS videocassette labeled PTL (1)" and related items; (3) *"after delivery by mail to and receipt by Daniel Gendron"* of a specifically described parcel (containing the tape) until the expiration of the warrant (ten days after its issuance). Gendron concedes that the warrant meets the Constitution's two basic requirements: its issuance was supported by "probable cause" to believe that evidence of criminal activity would exist in his house after the delivery of the tape; and it "particularly describ[es] the place to be searched, and the ... things to be seized." U.S. Const. amend. IV. He claims that it is nonetheless invalid because it is an "anticipatory warrant" which fails adequately to specify the *time* at which it will take effect. Gendron cites in support a recent case decided by a different panel of this court, *United States v. Ricciardelli*, 998 F.2d 8 (1st Cir. 1993).

▬▬ In general, the simple fact that a warrant is "anticipatory"—i.e., that it takes effect, not upon issuance, but at a specified future time—does not invalidate a warrant or make it somehow suspect or legally disfavored. Warrants often do specify that they will take effect upon issuance. But the Constitution imposes no such requirement. Rather, it says that a search must not be "unreasonable," and that warrants must be supported by "probable cause." U.S. Const. amend. IV. There is nothing unreasonable about authorizing a search for tomorrow, not today, when reliable information indicates that, say, the marijuana will reach the house, not now, but then. Nor does it seem automatically unreasonable to tie the warrant's search authority to the future event that brings with it the probable cause (e.g., the time of "delivery of a large brown package addressed to X with return address Y"). *Ricciardelli*, 998 F.2d at 10–11. In principle, the use of a "triggering event" can help assure that the search takes place *only* when justified by "probable cause"; and anticipatory warrants may thereby offer greater, not

lesser, protection against unreasonable invasion of a citizen's privacy. As one commentator has put it,

as a general proposition the facts put forward to justify issuance of an anticipatory warrant are more likely to establish that probable cause will exist at the time of the search than the typical warrant based solely upon the known prior location of the items to be searched at the place to be searched.

2 Wayne R. LaFave, Search and Seizure § 3.7(c), at 97 (2d ed. 1987). Were "anticipatory warrants" unlawful, law enforcement agents would have to wait until the triggering event occurred; then, if time did not permit a warrant application, they would have to forego a legitimate search, or, more likely, simply conduct the search (justified by "exigent circumstances") without any warrant at all. *See Vale v. Louisiana*, 399 U.S. 30, 34–35, 90 S.Ct. 1969, 1971–1972, 26 L.Ed.2d 409 (1970); 2 LaFave, *supra*, § 6.5. We are not surprised that courts have found "anticipatory warrants," considered as a class, perfectly consistent with the Constitution. *E.g., Ricciardelli*, 998 F.2d at 10–11; *United States v. Garcia*, 882 F.2d 699, 703 (2d Cir.1989); *United States v. Goodwin*, 854 F.2d 33, 36 (4th Cir.1988); *United States v. Hale*, 784 F.2d 1465, 1468–69 (9th Cir.1986); *People v. Glen*, 30 N.Y.2d 252, 331 N.Y.S.2d 656, 659, 282 N.E.2d 614, 617 (1972).

▬▬ Gendron argues, however, that the warrant's reference to "delivery by mail to and receipt by Daniel Gendron" does not describe with sufficient clarity its "triggering event," i.e., the particular time when it will take effect. We agree with Gendron that a warrant must clearly say when it takes effect. We also agree that a warrant that says it takes effect upon the occurrence of a future event runs a greater risk of ambiguity than a warrant that refers only to a specific day, month, and year (as do ordinary search warrants). That is why courts have required that the conditions upon which anticipatory warrants become effective be "explicit, clear, and narrowly drawn." *Ricciardelli*, 998 F.2d at 12 (quoting *Garcia*, 882 F.2d at 703–04). That said, however, we do not find any fatal flaw in the warrant's description.

First, the law's requirement with respect to specificity of time must be one of *reasonable* specificity. *Glen,* 331 N.Y.S.2d at 661, 282 N.E.2d at 619 (warrant should require search to be "reasonably contemporaneous" with arrival of contraband); 2 LaFave, *supra,* § 3.7(c), at 99 & n. 103 (citing *Glen*). One can understand how a specificity requirement in respect to time, like those in respect to "place to be searched" or "things to be seized," U.S. Const. amend. IV, might limit the discretion of law enforcement officers to decide when and where and what to search, thereby avoiding the "hated general writs of assistance of pre-Revolutionary times," *Glen,* 331 N.Y.S.2d at 659, 282 N.E.2d at 617, and assuring the existence of "probable cause." 2 LaFave, *supra,* § 3.7(c), at 99; *id.* § 4.5, at 207; *id.* § 4.6(a), at 236. But we know of no justification for a *stricter* standard in respect to specificity of time than in respect to the other two (constitutionally referenced) search parameters. *Ricciardelli,* while stating that the contraband must be on a "sure and irreversible course" to the place to be searched, 998 F.2d at 13, did not purport to set forth any *special* new rule requiring more specificity where time, rather than, say, place, is at issue. To the contrary, *Ricciardelli* says that a warrant's restrictions in respect to time and place should be "similar." *Id.* at 12.

Second, the law tells us that we are to read descriptions in warrants (and in their supporting documents), not "hypertechnical[ly]," but in a "commonsense" fashion. *United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965); *see also, e.g., United States v. Bianco,* 998 F.2d 1112, 1116–17 (2d Cir.1993); *In re Grand Jury Subpoenas,* 926 F.2d 847, 855 (9th Cir. 1991); *United States v. Antone,* 753 F.2d 1301, 1307 (5th Cir.1985); *United States v. Charest,* 602 F.2d 1015, 1017 (1st Cir.1979). Read in a commonsense fashion, the warrant's words seem specific and clear. Gendron takes the word "receipt," however, from the phrase "delivery by mail to and receipt by Daniel Gendron," and argues that it is fatally ambiguous because it might mean "receipt" anywhere, say, downtown or at the Post Office. But, as we have pointed out, *see supra* p. 958, context helps to provide a

word's meaning. The context includes, at least, the rest of the warrant, which describes Gendron's house, makes clear that the object of the search is a video that will arrive at that house by mail, and mentions "delivery by mail" to that house. Commonsense suggests that the words "receipt by Daniel Gendron" also refer to receipt at that house, and not to receipt downtown or at the Post Office, or (to use our own farfetched example) in Okinawa.

We recognize that it is logically possible to read the word "receipt" as if it referred to receipt somewhere other than at Gendron's house. But that logical fact does not make the word any less specific. The logical fact that the world undoubtedly contains people named "Daniel Gendron" other than the defendant here does not mean that the warrant's triggering event, "delivery by mail to and receipt by Daniel Gendron," is ambiguous because it does not specify that the "Daniel Gendron" to whom it refers is the one residing at the address to be searched. Despite the logical possibility that the post office might accidentally deliver the tape to some other Daniel Gendron, thus apparently fulfilling the literal terms of the warrant, the warrant is adequately specific as to the person to receive the tape. Specificity does not lie in writing words that deny all unintended logical possibilities. Rather, it lies in a combination of language and context, which together permit the communication of clear, simple direction. Any effort to negate all unintended logical possibilities through the written word alone would produce linguistic complication and confusion to the point where a warrant, in practice, would fail to give the clear direction that is its very point. That is why we must avoid reading a warrant's language "hypertechnically." *See Ventresca,* 380 U.S. at 109, 85 S.Ct. at 746.

Were it not for *Ricciardelli,* we would end the discussion here. We must concede, however, that *Ricciardelli* found unlawfully ambiguous a warrant with virtually identical language, namely, language that triggered the warrant upon

> delivery by mail to and receipt by Steven Ricciardelli of the ... package containing the videotape.

998 F.2d at 9. We find a significant difference, however, in the factual context in which the warrant was issued. The *Ricciardelli* panel referred to what it considered a critical fact:

> the (apparently significant) chance that the package would not be delivered to Ricciardelli's home at all—a possibility that [the postal inspectors] undeniably had envisioned.

*Id.* at 17. The opinion also makes clear that the "delivery by mail" was by special delivery with a "return receipt," and that the postal inspectors had "contingency plans" in the event that Ricciardelli received the package somewhere other than his home. *Id.* at 9, 17 & n. 9. (As it happened, the "letter carrier tried to deliver the package" but Ricciardelli was not home, so "the postman left a notice" that he could "collect the item at the post office," and Ricciardelli, in fact, did pick up the package at the Post Office, not at his home. *Id.* at 9–10.)

In light of these background facts, one can understand why the panel might have thought the word "receipt," in context, was ambiguous as to where the receipt might take place. After all, even the highly specific language in this case describing the item to be seized, namely "VHS videocassette labeled PTL (1)," *could* be thought ambiguous if the background of this case had revealed a serious possibility of *two* such items (imagine that Gendron had worked for a firm called "PTL Realty Co." and had taken home a series of demonstration videos). This is simply to say that background facts can sometimes turn hypothetical possibilities, such as receipt in Okinawa or delivery to the wrong Daniel Gendron, into practical possibilities that, in context, might mean that one reading a warrant in a "commonsense" fashion would nonetheless find significant ambiguity.

Here, however, no background fact created significant ambiguity. On the contrary, the postal inspector's affidavit specified that the parcel "will be placed for routine delivery" to Gendron "through the U.S. Postal Service, Rehoboth, MA"; that after the parcel "is delivered by mail *and taken into the residence*," there will be "probable cause to believe" that evidence of criminal conduct will be "located" in the house; and that

> surveillance will commence from the time the parcel is placed for delivery [at the Rehoboth Post Office] and continue until the parcel has been delivered to 105 Winthrop St., Rehoboth, MA,

with probable cause to search arising *only* "after the parcel has *entered the premises*" (emphasis added). Moreover, at trial, the postal inspector testified that

> if Mr. Gendron was in Florida, we aren't entitled to search his house or his parents' house. Once it was delivered *into the house,* then the search warrant became effective.

He added that the house was under surveillance because

> it was important to us that if that piece didn't get delivered, you don't execute the search warrant.

Tr. at 115–16 (emphasis added). Consequently, unlike *Ricciardelli,* nothing in the record here suggests a background in which the warrant's words, adequately specific in the context of the warrant, could, as a practical matter, convey a different meaning.

For these reasons, we distinguish *Ricciardelli* and find that it does not control the outcome here. To make certain that our reading of the case is correct, however, we have circulated a draft of this opinion to the entire court. The concurring judge in *Ricciardelli,* 998 F.2d at 17 (Torruella, J., concurring) believes that his views there would require a holding in Gendron's favor here. But, a majority of the court agrees with our reading of *Ricciardelli* which distinguishes that case from this one. *See, e.g., United States v. Rivera,* 994 F.2d 942, 950–51 (1st Cir.1993). We therefore do not accept Gendron's Fourth Amendment claim.

### IV

### *Other Arguments*

Gendron makes three further arguments, none of which requires extended discussion.

 1. *Jury Instruction.* Gendron argues that the trial court should have specifically instructed the jury that it must find he

knew the person depicted on the tape was under the age of 18. Gendron did not ask for this charge, nor did he object to the instruction the judge gave, which required the jury to find that he *"knew the character and nature of the material."* Nonetheless, he says that the judge's "error" was "plain." Fed.R.Crim.P. 52(b); *see generally Arrieta–Agressot v. United States*, 3 F.3d 525, 528 (1st Cir.1993). In context, however, we believe the charge the judge gave made the point that Gendron now makes. *See Estelle v. McGuire*, —— U.S. ——, —— & n. 4, 112 S.Ct. 475, 482 & n. 4, 116 L.Ed.2d 385 (1991) (in evaluating a jury charge, court should ask " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution," in light of "the context of the instructions as a whole and the trial record") (quoting *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990)). The jury was fully aware that the issue was *child* pornography. The remainder of the charge referred frequently to children. (Indeed, the film depicted a nine year old child.) Thus, in all likelihood, it understood the words "character and nature" to encompass age as well as explicit sexual acts. Since Gendron asked for no more and we can find no significant likelihood of prejudice, there is no plain error. *Arrieta–Agressot*, 3 F.3d at 528.

■ 2. *Closing Statement.* Gendron points to two statements in the prosecutor's closing argument that, he says, are factually erroneous and significantly prejudicial. In one instance, the prosecutor described the item that Gendron had ordered from the private mail order catalogue (sometime before 1985) as follows:

I think the title of it was Nancy. Nancy is described as 13, and her friends from No. 6, and No. 6 is prepubescence. Two pretty prepubescents are taught how to become geishas. This 10 year old, Nancy, and her friends, a 10 year old having sex with a 12 year old a delicate blond at 12, having sex with her playmate, 7, hide and seek, combat, rock. What is his interest in this, ladies and gentlemen? Children. Female children.

In fact, the record contains the relevant catalogue descriptions, which read as follows:

*E–2 NANCY:* 13, and her friends from # 6 THROB. An impish 10 year-old, a delicate blonde of 12, and a fetching 10 with her playmate of 7 hide-and-seek, tumble, and romp.

*J–6 KIMONO I:* Two pretty pubescents are taught how to become geishas. From full costume and make-up to nudity. Some censoring.

Gendron's argument centers on the absence of the phrase "having sex" in the actual descriptions.

In the other instance, the prosecutor described the pornographic tape that the government sent Gendron as containing

explicit depictions of a 9 to 11 year old girl being raped, being sexually abused, by teenage boys and an adult male.

In fact, the tape does not contain depictions of forcible rape (although, as the government points out, its depictions of a child engaging in sex amount to "statutory rape").

■ We agree with Gendron that the prosecutor's statements were wrong and that she should not have made them. We cannot agree, however, that they entitle Gendron to a new trial. That is because Gendron did not object to the statements at the time. Had he done so, we are certain that the district court would have ordered a correction, and a correction would have cured any harm by pointing out the facts. In the absence of an objection, however, we will normally not order a new trial unless there is a "substantial chance that absent the error the jury would have acquitted," or, for some other reason, we fear a "miscarriage of justice." *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985); *Arrieta–Agressot*, 3 F.3d at 528. We see no such miscarriage, nor any significant likelihood of acquittal, here.

■ The evidence in this case was strong, perhaps overwhelming. The jury saw portions of the tape, which portrays a nine year old girl engaging in sexually explicit activities with teenage and adult men. Gendron says nothing to suggest that the tape leaves any doubt about the unlawful nature of its con-

tents. Thus, in this particular case, we do not think the single use of the word "rape," forceful as it is, could have had any significant prejudicial impact on the jury beyond the impact of the tape itself. The question of the videotape descriptions, because of their relevance to the "predisposition" element of Gendron's entrapment defense, is a little closer. But, as we have described, *supra* p. 964, the evidence of predisposition was very strong. We do not believe the misdescription of the original mail order would likely have had any practical effect on the jury's "no entrapment" finding, particularly because the correct description was admitted into evidence and available to the jury. In light of the strength of the government's case ("an important factor in considering the likely effect of borderline rhetoric," *United States v. Mejia–Lozano*, 829 F.2d 268, 274 (1st Cir.1987)), whether we consider the two misstatements separately or together, the "error" they reflect is not "plain."

■■■ 3. *Other Erotica.* Gendron argues that the court erred in allowing, as evidence of "predisposition," various "child erotic" (but not illegal) items seized at his home. He does not seriously argue, however, that the items were not *relevant. See Jacobson*, —— U.S. at ——, 112 S.Ct. at 1542 (stating that similar material "by itself" was not sufficient to show predisposition). Rather, he says their usefulness was outweighed by their tendency to prejudice the jury. Fed.R.Evid. 403. The balancing at issue, however, is for the district court, not this court. *United States v. Williams*, 985 F.2d 634, 637 (1st Cir.1993). The court might reasonably have concluded, in light of the nature of the basic evidence in the case (the videotape itself), that the nature of the additional child-erotic material made no significant prejudicial difference. We find no abuse of discretion in this determination.

Gendron's additional arguments are without merit.

For the above reasons, the judgment of the district court is

*Affirmed.*

## APPENDIX

*Chronology of events in the Gendron case:*

November, 1984: Government agents discover Gendron's name on the mailing list of Milton Midge, a suspected child pornography distributor. Midge's records indicate that Gendron had ordered a videotape entitled "Nancy," whose description reads: *"NANCY: 13, and her friends from # 6 THROB. An impish 10 year-old, a delicate blonde of 12, and a fetching 10 with her playmate of 7 hide-and-seek, tumble, and romp."*

Spring, 1986: Post Office initiates an operation involving the fictitious "Far Eastern Trading Company" and sends a flier to Gendron (and others) asking those interested in information about Far Eastern's "youthful material" to return a coupon with the customer's name, address, and a signed affirmation that the customer is not a law enforcement officer interested in "entrapping Far Eastern Trading Company, its agents or customers."

October 12, 1986: Gendron fills out the coupon and returns it to Far Eastern. In reply, Far Eastern sends Gendron a catalogue of materials available for order. Each item's description clearly indicates that it depicts sexually explicit activities involving minors.

December 29, 1986: Gendron sends a handwritten letter to Far Eastern ordering two videotapes. The text of the letter is:

12–29–86

FROM

Mr. Daniel A. Gendron

[address]

Hi Peter:

I'm very happy to know you and very happy to know that I have finally found the kind of educational material I've been dreaming of possessing for quite some time. I'm sorry to say I have never had any delightful experiences of which I find in your catalogue.

I was getting very excited just reading your material. So excited that I have decided to order two of your titles in VHS format, LOLITA'S SEX LESSON 119.95 AND CHILDREN SEX ORGY 129.95 A

TOTAL OF 249.90 PLUS COD CHARGES.

I question why I could only pick two titles. Also the LOVELY TEENS TITLES had no prices listed. Do you have any specials on buying in larger quantities of VHS tapes. I would also like to know more about whether you have color tapes with sound and how many minutes long are they. Thank you.

/s/ Daniel Gendron

The government did not fill the order.

April, 1988: Gendron's name is found on the mailing list of N.M.P.C., a pornography distributor in Miami.

October, 1989: A new government sham company, "Artistes Internationale," sends a flier to Gendron (and others from the N.M.P.C. mailing list) indicating that it carried "extremely hard to obtain erotica," but not specifically mentioning child pornography. The flier asked those interested in more information to reply by letter.

October 16, 1989: Gendron sends a letter to Artistes requesting information about child pornography. The text of the letter is:

10/16/89

Daniel A. Gendron
[address]
Gentlemen

I am a customer of N.M.P.C. 6883 Bird Rd. # 102 Miami, Florida 33155 who has stated that they have contracted part of you [sic] services that they can handle in the U.S.A. Well like many others like me I am very interested in the other part of your services that are very diffcult [sic] to obtain in my country.

I am becoming very board [sic] with adult pornograpy [sic] and have always been interested in owning something different if you know what I mean. I am single 41 years of age with low income as a janitor. I like very young girls only and color videos. Can you help me. Thank you

/s/ Daniel Gendron

In reply, Artistes sends Gendron a catalogue. Each item's description clearly indicates that it portrays minors in sexually explicit activities.

December 18, 1989: Gendron submits an order to Artistes for four child-pornographic videotapes, along with a notation reading "Please send more order forms and materials," and a Christmas card. The order was not filled.

March 17, 1990: Gendron places an order with a third sham company, "Can American," for two videotapes whose descriptions clearly indicate their child-pornographic content.

May 4, 1990: Gendron writes a letter to Can American complaining about the delay in filling his order. The text of the letter is:

Gentlemen:

Have you forgotten my order of March 17th. It is now May 4, 1990. I sent you a good check for 149.90 to pay for one tape PTL(1) and one mag LVM(2).

Sufficient time for a check to clear is two weeks. It has been 7 weeks. If you cannot deliver as promised then cancel my order and return my check or if you have already cashed it send me a refund. Please don't force me to take other action to get my money back. Don't worry, I am not connected in any way with law enforcement. This is the first time I have ever sought to obtain this type of educational materials [sic]. I wanted it for my small library of video collections. Please Hurry.

/s/ Dan Gendron

May 16, 1990: Law enforcement officers obtain an anticipatory search warrant from U.S. Magistrate Joyce London Alexander, which authorizes a search of Gendron's house after the Can American tape is delivered to him.

May 18, 1990: The post office delivers the tape to Gendron. Shortly thereafter, law enforcement officers execute the search warrant and search Gendron's house, seizing the Can American tape and various related items.

LOUIS H. POLLAK, District Judge (concurring).

I concur in the judgment of the court and in the court's carefully wrought and illuminating opinion. The opinion addresses, com-

prehensively and in painstaking detail, all of the substantial questions presented. I would add only a few words.

*First.* As the court's opinion makes clear, constitutional difficulties of serious dimension would attend the child-pornography statute if, in prosecutions for knowing receipt of a "visual depiction" of "a minor engaged in sexually explicit conduct," 18 U.S.C. § 2252(a)(2), the phrase "knowingly receives" were not construed as requiring the government to establish, beyond a reasonable doubt, that the "visual depiction" was one which the defendant knew to involve, not just pornography, but *child* pornography. These potential constitutional difficulties are obviated by the court's persuasive demonstration of "congressional awareness of the important constitutional differences between adult and child pornography," with the result that, as the court concludes, the proper reading of what Congress wrote is "that the statute's word 'knowingly' applies to age as well as conduct."

In the case at bar, appellant Gendron contends that the pertinent aspect of the charge given by the trial court—namely that the government was required to prove that Gendron "knew the character and nature of the material"—was deficient in that it did not say expressly that the government had to have proved that Gendron knew that one of the actors depicted in the videotape was a minor. But, as the court notes, Gendron did not request such an instruction. Moreover, as the court shows, it is highly unlikely that the jury could have failed to understand that the central focus of the charge was that Gendron was eager to acquire, and through the government's good offices ultimately did acquire, a videotape depicting *child* pornography. That is to say, in the case at bar the fact that the trial court did not give the more particularized charge that appellant did not request cannot realistically be supposed to have affected the jury's deliberations in a fashion detrimental to appellant. In future trials under this statute, defendants will presumably request, and trial courts will surely give, a more particularized statement of what "knowingly" comprehends.

*Second.* The fact that the methods pursued by government agents to offer Gendron a tempting opportunity to commit a crime were not only successful but have been found by this court (correctly, in my view) not to have been unlawful—i.e., not to have crossed the line into the forbidden realm of entrapment—does not, in my judgment, signify that those methods of enforcing this sort of statute are something to be proud of.