UNITED STATES of America, Plaintiff–Appellant,

v.

Floyd Dewayne BEAL, Defendant–Appellee.

No. 91–4106.

United States Court of Appeals, Tenth Circuit.

April 21, 1992.

David J. Schwendiman, Asst. U.S. Atty., Salt Lake City, Utah (Paul Warner, U.S. Atty., with him on the brief), for plaintiff-appellant.

Craig S. Cook, Salt Lake City, Utah, for defendant-appellee.

Before MOORE, ALDISERT,[*] and McWILLIAMS, Circuit Judges.

JOHN P. MOORE, Circuit Judge.

The government appeals from an order granting defendant Floyd Dewayne Beal's motion for judgment of acquittal. In a two count indictment, the defendant was charged with participating in two discrete transactions which resulted in the sale of a controlled substance to an undercover police officer. Mr. Beal admitted the nature and substance of the transactions but claimed that his participation was the result of entrapment by a government informant. The entrapment defense was the only issue submitted to the jury, which returned verdicts of not guilty on the first count but guilty on the second.

Ruling upon a subsequent motion for judgment of acquittal, the trial court concluded as a matter of law the two transactions were inseparable, and the defendant was induced to commit the second transaction by the same influence which caused him to commit the first. Resolution of the appeal lies simply in whether, upon the facts of this case, the trial court correctly ruled that the two transactions were part of one course of conduct. We conclude that it did, and we affirm the judgment of acquittal.

Despite differences over the details, the essential facts are not in dispute. Roger Silva, whom the defendant met while the two were imprisoned in 1981, was arrested by Utah police on a charge of distributing cocaine. Realizing he was "facing a 1-to-15-year sentence" and would remain in jail, (R I, 83), Mr. Silva contacted police officials to see whether they would be inclined to make a deal with him. Eventually, Mr. Silva met with Sergeant Carroll Mayes, an undercover Salt Lake City narcotics officer.

Sgt. Mayes explained he was interested in arresting large narcotics and stolen property dealers, and he would work with Mr. Silva to effect those arrests. In exchange for participating in a large scale "sting" operation which eventually snared fourteen persons, Mr. Silva was promised "that I would get all my charges dropped and dismissed completely against me if I wanted to work for them." (R I, 9). While Mr. Silva did not believe he was given a "guarantee" that his charges would be dismissed, it was his "assumption" that the more transactions he arranged, the better the deal he would get from the police. (R I, 82). Sgt. Mayes denied having made any promises to Mr. Silva, (R II, 8), but over the three month course of their relationship, he did give Mr. Silva $1,590 "just to keep him going." (R II, 9).

Sgt. Mayes instructed Mr. Silva to contact people known to Mr. Silva to see whether they were currently engaged in criminal activity. If so, Mr. Silva was to call Sgt. Mayes for further instructions. Sgt. Mayes cautioned, however, Mr. Silva was:

to be very careful in that I didn't want him trying to coerce anyone into selling drugs. I didn't want him excessively pestering people to try to get them to sell drugs, didn't want him to use anything, no threats, no nothing. Either they want to do business, they will do business; and if they don't want to, they won't. And I made it very clear to him that he needed to understand that, and he said that he did.

[*] The Honorable Ruggero J. Aldisert, United States Circuit Judge for the United States Court of Appeals for the Third Circuit, sitting by designation.

(R II, 8). With those instructions in mind, Mr. Silva contacted a number of people including defendant Beal.

His first attempts to reach Mr. Beal were unsuccessful. On several occasions, Mr. Silva managed to talk to defendant's mother with whom he left messages, and on others, he left messages on the family's telephone recording machine. ( R II, 151). Mr. Beal, however, tried to avoid Mr. Silva, but after at least seven attempts, *id.*, Mr. Silva was eventually successful in achieving his quest.

Although there is disagreement over who placed the call, contact was made on November 23, 1989. During that conversation, Mr. Silva explained he was interested in obtaining methamphetamine. According to Silva, defendant responded, "he was going to school, going to school and working at that time; but he told me he could get me some, but he didn't have none right there at that time." (R I, 12). Defendant's version of the conversation differs, but both agree that Mr. Beal's reply indicated he had no drugs to sell Mr. Silva. Mr. Silva then responded he would call back to see if Mr. Beal obtained a source of supply.

After several attempts on the next day, at about 3:00 to 4:00 p.m., Mr. Silva reached Mr. Beal. (R I, 14). Mr. Silva stated his "cousin," who was in reality Sgt. Mayes, was coming to town and wanted to buy an "eight ball" of "crank" (.8 oz. methamphetamine). According to Mr. Silva, he called Mr. Beal later that day and arranged to meet at 6:00 p.m.

Sgt. Mayes and Mr. Silva drove to the meeting place at the proper time and picked up Mr. Beal who told Sgt. Mayes to follow another car to a place where the transaction would occur. When they arrived, Sgt. Mayes gave Mr. Beal $250, which the defendant took to the occupants of the other car, returning after a short wait with a packet of substance which later proved to be methamphetamine. Sgt. Mayes testified that as a "commission" for making the transaction, Mr. Beal took a "pinch" of the substance and placed it in a cellophane wrapper. (R II, 19). Defendant testified he did not keep the pinch, but

returned it to the man who had supplied the substance. (R II, 119).

Within "four to five hours later," (R I, 25), Mr. Silva and Mr. Beal had another conversation. Mr. Silva testified he could not remember who made the call, (R I, 25), but Mr. Beal testified Mr. Silva called him. (R II, 87). Acting on instructions from Sgt. Mayes that the police wanted to make another buy from Mr. Beal, Mr. Silva told him "Drew" (Sgt. Mayes' undercover name) "wanted to get some more." (R I, 26). When Mr. Beal apparently indicated a willingness to serve, Mr. Silva recalled Sgt. Mayes who told him to set up the transaction. It was arranged that Mr. Silva and Sgt. Mayes would meet Mr. Beal at a convenience store near the latter's home at 11:00 p.m.

When Sgt. Mayes and Mr. Silva arrived, Mr. Beal was waiting. He got in their truck and directed them to a house nearby. Parked at the house was the same vehicle they had met during the course of the first transaction. In the house, Sgt. Mayes was introduced to the occupants, "Bob" and "Karen." After approximately an hour and forty-five minutes, Bob announced he was unable to locate his source; therefore, Mayes, Silva, and defendant agreed to leave with a promise to get in touch on the next day.

As agreed, Mr. Silva called the next day and arranged another meeting at the convenience store at approximately 3:30 p.m. (R II, 23). From there, Sgt. Mayes, Mr. Silva, and Mr. Beal again went to the residence of Bob and Karen. At the house, another transaction was concluded during the course of which Mr. Beal took money from Sgt. Mayes, went outside, and returned with a bag of a substance later identified as methamphetamine.

Mr. Silva, Sgt. Mayes, and Mr. Beal all testified to a different version of what took place in the house. Those differences notwithstanding, both Mayes and Silva agreed that before Sgt. Mayes received the substance, defendant "tested" it by injecting into his arm a solution made from the contents of the bag. (R II, 25). Mr. Beal denied doing so and stated it was Bob who

made the injection. (R II, 89). Sgt. Mayes and Mr. Silva then left, concluding the second transaction.

Throughout his testimony, Sgt. Mayes reiterated that at no time did Mr. Beal appear reluctant to deal with him or otherwise indicate Mr. Beal's actions were not the product of his free will. Mr. Silva, however, repeated statements made to him by Mr. Beal that he was not dealing in "dope," and that he was working and going to school. Indeed, Mr. Silva testified that after the second transaction, Mr. Beal stated, "You know, Roger, I'm not selling dope. I done this as a favor to you." (R I, 44).[1]

For his part, Mr. Beal told the jury he arranged both transactions just to get rid of Mr. Silva and his insistent calls. (R II, 81). Indeed, he even aborted a final attempt by Mr. Silva and Sgt. Mayes to make another transaction by taking the money proffered by Sgt. Mayes and running away with it. He apparently thought by doing so he would not be asked again to broker a transaction. (R II, 132). Neither his theft of the money nor his purpose was disputed.

Mr. Beal maintained that his only interest in brokering the two consummated transactions was to make a connection between Mr. Silva and Bob so that Mr. Silva could satisfy his needs from that source and leave Mr. Beal alone. (R II, 81). Sgt. Mayes, however, said at no time when they were in Bob's presence did Mr. Beal make any effort to effect that connection. In contrast, Mr. Silva recognized from their first meeting Mr. Beal attempted to introduce him and "Drew" to Bob because Bob was the source of supply. (R I, 104).

Defendant filed a post-verdict motion for judgment of acquittal contending "the events alleged in Counts I and II were so closely connected that it is totally unreasonable to conclude that the defense of entrapment some how [sic] dissipated." The government responded, as it contends

here, that each count of the indictment is a separate charge to be regarded as such by the jury; therefore, it is not unreasonable for the jury to have determined the defendant was not predisposed to commit one transaction but was predisposed to commit the other.

The district court entertained extensive argument on the motion. After considering the arguments of both sides, the court stated:

Well, I was troubled by this case when the jury verdict came back. It does seem to me that this is a case in which there was a strong original inducement and that in fact this defendant was preyed upon by the government informant to do something that he was not predisposed to do. I think he had his weakness played upon, he was beguiled, and it is a matter of logic that the jury recognized that and held him to be entrapped on the first charge.

I think that the second charge came in the same ballpark, the same course of conduct as the first and was the product of the original inducement.

Upon the basis of this conclusion, the court set aside the guilty verdict on the second count and granted judgment of acquittal. It is from that order the government appeals.

■ The defense of entrapment was first recognized for federal courts in *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932). There the Court held that the function of law enforcement is to prevent crime and apprehend criminals and not to manufacture crime. While surreptition is a valid tool in the detection of criminal transactions,

[a] different question is presented when the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged of-

---

1. Made clear in the evidence are several other facts. First, at no time did Mr. Beal have methamphetamine in his possession to sell. Second, the purchase money received from Sgt. Mayes was given by Mr. Beal to a third person. Third, no evidence was produced showing defendant

took money for himself. Fourth, Mr. Beal's only source of drugs was through Bob, who was not always able to deliver the requested substance. While these facts are not dispositive, they do bear on the question of Mr. Beal's predisposition to deal in controlled substances.

fense and induce its commission in order that they may prosecute. *Id.* at 442, 53 S.Ct. at 212–13. Entrapment does not occur when government officials merely offer a person the opportunity and means to commit an offense. Instead, when the criminal act is "the product of the creative activity" of the government, entrapment results. Thus, the inquiry is whether the accused was predisposed to commit the offense or government actors put the notion in his mind. *United States v. Ortiz*, 804 F.2d 1161, 1165 (10th Cir. 1986).

 Ordinarily, entrapment is a question of fact, but a court may conclude as a matter of law that a defendant was subjected to entrapment when the essential facts are not disputed. *Id.* at 1164. That is precisely what occurred in this case. Because the decision made by the district court is legal in nature, we review it *de novo. Id.*

The government first contends that it established each element of the offense charged in Count II. That, however, is irrelevant to the appeal. Since the defendant admitted his factual guilt of the charges, whether the prosecution proved its case is not an issue. The government uses the argument, however, in an oblique attack on the district court's power to grant a judgment of acquittal, maintaining the court had to reweigh the evidence and substitute its judgment of the credibility of the witnesses. The argument begs the issue.

 In ruling on the motion for judgment of acquittal, the trial court held, as a matter of law, the defendant was entrapped on both counts. Despite the government's argument to the contrary, that ruling did not depend upon a weighing of the evidence or a judgment upon the credibility of witnesses. To the contrary, the trial court's order was founded upon undisputed evidence relating to the events of the twenty-four hour period during which the drug transactions occurred.

The key to the trial court's holding is the statement that "the second charge came in the same ballpark." That colloquialism expresses the conclusion that there was an unbroken continuum of events from Mr. Silva's initial contact with Mr. Beal to the conclusion of the second transaction. The significant testimony describing the events which took place during that time is undisputed.

There is no argument over the time period during which the two transactions were conducted. By all testimony, they began with a telephone conversation between Mr. Silva and Mr. Beal at about 3:00 to 4:00 p.m. on November 24, 1989, and concluded in the late afternoon of the following day. During the course of that time, there is no disagreement over the contacts made by Mr. Silva to solicit Mr. Beal's participation in three transactions, one of which aborted when Bob was unable to obtain drugs. Thus, there was ample undisputed evidence upon which we may conclude the second transaction was temporally in the "same ballpark" as the first.

Additionally, the court considered the testimony of the witness and concluded the evidence showed "the same course of conduct" between the parties. Except for irrelevant details in the chain of events, the testimony of all three participants describing their conduct during the two transactions is the same. Furthermore, that testimony discloses no variation in circumstances that would show Mr. Beal had a change of mind between the two transactions. The prosecution's testimony tending to show defendant's predisposition notwithstanding, the facts shown are of essentially the same nature regarding both transactions. Moreover, the testimony of inducement applied by Mr. Silva during both transactions is fundamentally the same.

There is no real dispute that Mr. Silva was the initiator of both transactions. Although he stated Mr. Beal may have called him to arrange the transactions, he also stated he may have made the calls himself. Therefore, his version was equivocal. The descriptions of Mr. Beal's demeanor during the course of those events given by Sgt. Mayes and Mr. Silva were the same. Both implied Mr. Beal was a willing participant, and neither indicated his demeanor during

the two events differed. As proof of different evidence of predisposition, the government seizes on the disputed testimony that Mr. Beal injected himself during the second transaction. That, however, is distinguishable from the testimony he took a "pinch" of substance during the first transaction only by degree.

These circumstances show no change in the attitude of the defendant before the first and the second transactions. There is nothing contained in the government's proof which provides a factual distinction between defendant's manifested state of mind during those transactions. Thus, we believe there is ample support in the uncontroverted testimony to conclude the "course of conduct" of the two transactions was the same.

Moreover, evidenced by the number of calls he placed to the defendant's home, it is not disputed that Mr. Silva's attitude towards the defendant was, at least, persistent. Motivated as he was to make as many contacts as possible to save himself from prison and to obtain money "to keep him going," Mr. Silva was sufficiently endowed with motive to produce the "strong" inducement noted by the trial court. Because the two counts were founded upon one continuous course of conduct, it follows that the original inducement which "beguiled" Mr. Beal carried over to the second charge. *Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958).

In *Sherman*, the government's informant met the defendant at a doctor's office where the two were going for treatment of drug addiction. After persuasion by the informant, the defendant agreed to obtain drugs for him, not only sharing the cost but also the drugs. After several transactions of this nature, the defendant was arrested and charged with separate counts of selling narcotics. The only defense was entrapment, and the defendant contended that even though the charges were founded upon discrete drug transactions, the coercion of the informant applied to each charge.

The Court agreed, holding:

It makes no difference that the sales for which petitioner was convicted occurred after a series of sales. They were not independent acts subsequent to the inducement but part of a course of conduct which was the product of the inducement.

*Id.* at 374, 78 S.Ct. at 822. In the present case, the second transaction was no more a discrete crime than were the separate sales in *Sherman*.

Moreover, the course of conduct in this case was completed over a period of approximately twenty-four hours. In *Sherman*, the transactions between defendant and informant took place over an extended period. The concentration of Mr. Silva's efforts in the shortened time span in this case merely underscores the validity of the district court's conclusion that Mr. Beal was "in the same ballpark" and was acting under the influence of the original inducement.

■ Having concluded the trial court correctly reasoned, under the facts of this case, the discrete acts of the defendant were part of the same continuum of events motivated by the same influence, we do not reach the other issues presented by the parties. Mr. Beal would like us to hold as a general rule that once entrapment occurs, a defendant's subsequent willing acts are immunized from culpability. We are not persuaded to do so. We shall follow this case only as far as it takes us. Suffice, then, that the line ends with the legal conclusion that under the facts of *this* case the original inducement and not the defendant's predisposition provided motive for his otherwise criminal acts.

As the Court most recently stated in *Jacobson v. United States*, — U.S. —, 112 S.Ct. 1535, 118 L.Ed.2d 147 (1992):

Law enforcement officials go too far when they "implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." *Sorrells* [*v. United States*], 287 U.S. [435] at 442 [53 S.Ct. 210, 212–13, 77 L.Ed. 413] [ (1932) ]....

[W]e conclude that this is such a case and that the prosecution failed, as a matter of law, to adduce evidence to support the jury verdict that petitioner was predisposed, independent of the Government's acts and beyond a reasonable doubt, to violate the law....

112 S.Ct. at 1536, 1543.

AFFIRMED.

McWILLIAMS, Senior Circuit Judge dissents:

After his conviction on count two, Beal filed a motion for judgment of acquittal and a motion for a new trial. Following hearing, the district court granted the motion for judgment of acquittal, set aside the jury's verdict, and entered a judgment of acquittal. The district court did not rule on Beal's motion for a new trial.

Fed.R.Crim.P. 29 reads as follows:

**Rule 29. Motion for Judgment of Acquittal**

**(d) Same: Conditional Ruling on Grant of Motion.** If a motion for judgment of acquittal after verdict of guilty under this Rule is granted, the court shall also determine whether any motion for a new trial should be granted if the judgment of acquittal is thereafter vacated or reversed, specifying the grounds for such determination. If the motion for a new trial is granted conditionally, the order thereon does not affect the finality of the judgment. If the motion for a new trial has been granted conditionally and the judgment is reversed on appeal, the new trial shall proceed unless the appellate court has otherwise ordered. If such motion has been denied conditionally, the appellee on appeal may assert error in that denial, and if the judgment is reversed on appeal, subsequent proceedings shall be in accordance with the order of the appellate court. (As amended Feb. 28, 1966, eff. July 1, 1966; Nov. 10, 1986, Pub.L. 99–646 § 54(a), 100 Stat. 3607.)

In view of Rule 29(d), Beal sent a letter to the district court pointing out the necessity for a ruling on his motion for a new trial. We are advised the district court has not ruled on the matter.

In this court, Beal moved to dismiss the present appeal as being premature, contending that this court does not have jurisdiction because the district did not rule on his motion for a new trial. There has not been compliance with Rule 29(d), and accordingly I agree with Beal that this court does not have jurisdiction since a final judgment has not yet been entered by the district court. I would dismiss the appeal as being premature.

The majority agrees with the district court that the evidence showed entrapment as a matter of law on both counts one and two. I disagree and would hold that the question of entrapment posed an issue of fact as to both counts, a fact matter to be decided by the jury. I reject any suggestion that because the jury acquitted Beal on count one, the district court was compelled to grant a motion for judgment of acquittal on count two.