USCA1 Opinion

 

United States Court of Appeals

For the First Circuit

 

No. 99-2279

UNITED STATES OF AMERICA,

Appellee,

v.

LUIS TOM, a/k/a CUBA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Torruella, Circuit Judge,

Campbell and Stahl, Senior Circuit Judges.

 Martin D. Boudreau, for appellant.

 Cynthia A. Young, Assistant United States Attorney, with whom
Michael J. Sullivan, United States Attorney, were on brief, for
appellee.

June 3, 2003

 TORRUELLA, Circuit Judge. Defendant-appellant Luis Tom,
also known as "Cuba," was convicted by jury of conspiring to
possess cocaine base with intent to distribute, possessing cocaine
base, distributing cocaine base, and aiding and abetting the
possession and distribution of cocaine base. Tom was sentenced to
seventy-eight months on each count, to run concurrently, and
ordered to pay a $200 special assessment. He now appeals, arguing
that (1) he should have been acquitted under an entrapment defense;
(2) the jury instruction on entrapment was erroneous; (3) the
district court made two evidentiary errors; and (4) the district
court erred in failing to grant an adjustment for a minor role in
the offense and refusing to grant a downward departure for
overestimated criminal history. After careful consideration of
each issue, we affirm the conviction and sentencing.

I. Background

 In 1998, agents and officers of the Drug Enforcement
Administration ("DEA"), the Worcester Police Department, the
Massachusetts State Police, and the United States Marshals Service 
began an investigation into drug trafficking, particularly
trafficking in cocaine base, or "crack," that initially focused on
the Quisqueya nightclub on Main Street in Worcester, Massachusetts. 
As part of that investigation, DEA Special Agent Michael Pevarnik
directed the cooperating witness John Quezada, an individual who
had previously worked with the DEA on approximately 30 cases and
who spoke both English and Spanish, to become a "regular" at the
Quisqueya nightclub. Quezada began frequenting Quisqueya, calling
Pevarnik after each visit.

 On July 11, 1998, Quezada went to Quisqueya, where he
overheard a woman named "Wanda" tell Tom that she was waiting for
heroin that had not arrived yet. Later that evening, Quezada
talked to Tom, whom he had not known previously, and informed him
of his need for "a good connection" for heroin and crack cocaine. 
Tom replied that he had connections in Miami and New York, and gave
Quezada his telephone number.

 Shortly thereafter, Quezada called Tom to inquire about
purchasing one ounce of crack cocaine. Tom agreed to try to find
Quezada some crack cocaine. In a recorded conversation on July 15,
1998, Tom told Quezada that he was trying to arrange for Quezada to
purchase the crack cocaine from a "white guy" who had 90% pure
crack cocaine that he would sell for $300. Tom also said that his
partner was going to New York, and that he, Tom, was "thinking of
doing this business directly with you." When Quezada said that he
was looking for someone to continue dealing with in the future, Tom
told Quezada that he did not "like that scene." He added, "What I
like is grass." But Tom also said that he would make the
connection for Quezada, and the deal would be "[j]ust between you
and me." At the end of their conversation, Tom told Quezada to
call him the following day.

 On July 16, 1998, in another recorded telephone
conversation, Tom told Quezada that the supplier had nearly three
ounces of crack cocaine available. Tom wanted Quezada to talk to
the supplier to see if the cocaine was to his liking.

 Quezada went to the Quisqueya Club the next day, and
encountered Tom there. Tom quoted him three different prices --
$650, $800, and $1300 per ounce, depending on the quality -- for
the crack cocaine. Tom also told Quezada that he could supply
Quezada with heroin and promised to contact Quezada later.

 On July 21, 1998, Tom called Quezada to discuss the crack
transaction further. In a recorded conversation, Tom told Quezada
that he had not yet settled on a price with the crack supplier, but
that he was to talk to the supplier the next day and then call
Quezada. The next day, Quezada was supposed to meet Tom to
purchase the crack, but the transaction did not occur because Tom's
supplier had been arrested.

 Tom arranged an alternate transaction with Jarrot Carter,
or "Blunt," for the purchase of one ounce of crack cocaine for
$800. Quezada made this purchase, and three others, from Carter.

 Based on the foregoing information, Tom was tried and
convicted by jury verdict on all counts, sentenced by the court to
seventy-eight months on each count -- to run concurrently -- and
ordered to pay a $200 special assessment. This appeal followed.

II. Discussion

A. Entrapment

 This Court reviews "de novo [Tom]'s claim that the
district court should have granted his motion for judgment of
acquittal because he was entrapped as a matter of law." United
States v. LaFreniere, 236 F.3d 41, 45 (1st Cir. 2001). We review
the evidence in the light most favorable to the prosecution to
determine whether a rational jury could have found the defendant
guilty beyond a reasonable doubt. Id.

 The entrapment defense involves "two elements: (1)
government inducement of the accused to engage in criminal conduct,
and (2) the accused's lack of predisposition to engage in such
conduct." United States v. Rodríguez, 858 F.2d 809, 812 (1st Cir.
1988) (citing Mathews v. United States, 485 U.S. 58 (1988)). Once
a defendant has made a sufficient threshold showing to raise the
question of entrapment, the burden shifts to the government to
prove beyond a reasonable doubt either that there was no inducement
or that the defendant was predisposed to commit the offense. 
Rodríguez, 858 F.2d at 815.

 As to the inducement prong of the defense, the evidence
demonstrates that Quezada did not improperly induce Tom to engage
in crack cocaine trafficking. "Government agents may not originate
a criminal design, implant in an innocent person's mind the
disposition to commit a criminal act, and then induce commission of
the crime so that the [g]overnment may prosecute." Jacobson v.
United States, 503 U.S. 540, 548 (1992) (citing Sorrells v. United
States, 287 U.S. 435, 442 (1932)). It is undisputed that
"[a]rtifice and stratagem may be employed to catch those engaged in
criminal enterprises." Sorrells, 287 U.S. at 441; LaFreniere, 236
F.3d at 46. Quezada initially approached Tom for a heroin and
crack cocaine "connection" and called Tom several times over the
course of two weeks, but this does not establish the dogged
pressure characteristic of inducement. See United States v.
Tejeda, 974 F.2d 210, 218 (1st Cir. 1992) (indicating that
informant's actions initiating most of calls and "diligently
pursu[ing]" drug transaction does not establish "persistent
badgering" or inducement). Tom did not return most of Quezada's
calls, a fact which suggests he felt neither compelled nor
pressured to contact Quezada. Further, Tom did not ask Quezada to
stop calling. See United States v. Acosta, 67 F.3d 334, 338 (1st
Cir. 1995) (where defendant did not make explicit request to be let
alone, jury decision that there was no inducement was reasonable). 
Here, the government simply provided an opportunity for Tom to
engage in a drug conspiracy but did not engage in any prohibited
coercion to encourage him to do so. (1) Taken together, this evidence
proved beyond a reasonable doubt that the government did not
improperly induce Tom to commit crime.

 There was also substantial evidence to support a finding
that Tom was predisposed to deal in crack cocaine. Predisposition
can be shown where a defendant "promptly avail[s]" himself of a
government-provided opportunity to commit a crime. Jacobson, 503
U.S. at 549. In this case, it is clear that Tom was predisposed to
deal drugs because he immediately responded to Quezada's request
for a "good connection" by giving him his phone number and
informing him that he had the necessary connections. Within two
weeks, Tom had introduced Quezada to multiple dealers and indeed a
drug transaction was consummated. Cf. United States v. Vega, 102
F.3d 1301, 1307 (1st Cir. 1996) (finding defendant was predisposed
where he "supplied [the DEA special agent] with narcotics within
one hour of their first encounter").

 This Court has held that predisposition is evaluated by
considering "how the defendant likely would have reacted to an
ordinary opportunity to commit the crime." Gendron, 18 F.3d at
962. Factors to be weighed in making this determination include
"(1) [defendant]'s character or reputation; (2) whether the initial
suggestion to commit the crime was made by the government; (3) 
whether [defendant] was engaged in criminal activity for profit;
(4) whether he showed reluctance to commit the offense, which was
overcome by governmental persuasion; and (5) the nature of such
persuasion or inducement." LaFreniere, 236 F.3d at 46. In spite
of Tom's claimed reputation as a hard-working family man, he
clearly had knowledge of and experience in the drug market. See
Kadis v. United States, 373 F.2d 370, 374 (1st Cir. 1967) ("It
cannot be enough . . . where the defendant readily agreed to engage
in a criminal act, to show that he enjoys a good reputation."). 
Although Quezada approached Tom about needing to find a crack and
heroin supplier, Tom showed no reluctance to help and needed no
persuasion to assist Quezada in procuring the drugs. Indeed, Tom
replied that he had connections in Miami and New York and furnished
his own telephone number, strongly implying that he was open to
further dealings. Ready agreement to commit a crime can
"adequately evince an individual's predisposition." United States
v. Gifford, 17 F.3d 462, 469 (1st Cir. 1994). Finally, we have
already discussed the government's actions and found they did not
constitute improper inducement.

 Further, evidence of predisposition may be inferred from
conversations in which a defendant displays knowledge or experience
in the criminal activity under investigation. Tejeda, 974 F.2d at
218 (highlighting evidence of familiarity with "drug trade lingo"
and knowledge of the going rate of cocaine); United States v.
Panet-Collazo, 960 F.2d 256, 259-260 (1st Cir. 1992) (noting
tape-recorded conversations in which, inter alia, defendant bragged
that he had "worked with cocaine a lot"). Here, Tom's discussion
of the virtues of pure crack versus crack that has been "cut," and
his attestations to the quality of Carter's crack cocaine evidences
his familiarity with the drug trade. Moreover, during Quezada's
first meeting with Carter, Carter told Quezada that Tom had been
"deal[ing] with me for years, man." Tom's comments about Carter in
that same conversation confirmed that his relationship with Carter
was not new.

 Considering the body of evidence available regarding
Tom's willingness to participate in the drug trade and the
obviousness of his previous engagement in such business along with
the permissible actions taken by the government to provide the
opportunity to commit the crime, we find the district court did not
err in permitting the government's case against Tom to go to the
jury.

B. Jury Instructions

 Tom also challenges the jury instructions regarding
entrapment. Where the alleged error involves the instructions'
adequacy in explaining the law, this Court reviews jury
instructions de novo. United States v. Woodward, 149 F.3d 46, 65
(1st Cir. 1998). Challenges to the form or wording of an
instruction are reviewed under the abuse of discretion standard. 
Id. at 69 n.14. In either case, this Court conducts its review by
looking at the entire charge, in light of the evidence, and
"determin[ing] whether, taken as a whole, the court's instructions
fairly and adequately submitted the issues in the case to the
jury." Id. at 69 (internal quotations and citations omitted). Tom first argues that the instructions (2) did not allow the
jury to find that he was induced to commit the crime because he was
unfairly persuaded to introduce Quezada to Carter. Improper
inducement consists of "an 'opportunity' plus something else -- 
typically, excessive pressure by the government upon the defendant
or the government's taking advantage of an alternative non-criminal
type motive." Gendron, 18 F.3d at 961 (emphasis omitted). The
district court's instruction placed the issue of persuasion before
the jury through its instruction that "inducement refers to
government conduct which persuades a person to turn from a
righteous path to an unlawful one." In addition, the court
explained to the jury that "pressure" could range from pleading to
coercion. (3) See United States v. Terry, 240 F.3d 65, 69-70 (1st
Cir. 2001). The instructions adequately presented the law and
Tom's theory of the case.

 Tom also objects to the district court's reference to the
"unwary criminal" in its instructions. The phrase "unwary
criminal" here was merely intended to focus the jury on whether Tom
was predisposed to participate in a drug conspiracy. Courts have
frequently used the phrase "unwary criminal" to refer to a person
predisposed to commit a particular crime. See, e.g., Mathews, 485
U.S. at 63 (indicating predisposition "focuses upon whether the
defendant was an 'unwary innocent' or, instead, an 'unwary
criminal' who readily availed himself of the opportunity to
perpetrate the crime"); Sherman v. United States, 356 U.S. 369,
372-73 (1958) ("To determine whether entrapment has been
established, a line must be drawn between the trap for the unwary
innocent and the trap for the unwary criminal . . . . On the one
hand, at trial the accused may examine the conduct of the
government agent; and on the other hand, the accused will be
subjected to an 'appropriate and searching inquiry into his own
conduct and predisposition' as bearing on his claim of
innocence."). Use of the phrase in the jury instructions does not
contradict current law. Considered as a whole, the district
court's instruction on entrapment was appropriate and legally
accurate.

C. Evidentiary Issues

 Tom presents two evidentiary issues on appeal: the
admission of hearsay regarding predisposition and an agent's
alleged vouching for the credibility of a witness. Evidentiary
rulings that are objected to below are reviewed for abuse of
discretion. United States v. Marino, 277 F.3d 11, 24 (1st Cir.
2002). Where Tom did not object to the evidentiary issues during
trial, we are limited to plain error review. See United States v.
Woods, 210 F.3d 70, 78 (1st Cir. 2001).

 1. Hearsay Regarding Predisposition

 Tom objects to admission of the following testimony:

 Q. And did he [Carter] say, "Yo, he deal
with me for year, man. He know,
believe me. I wouldn't" - "I wouldn't
play games. Yo, call me, call me
again. Matter of fact, would you do
this? I'm leaving to New York right
now, when I drop him off." Do you see
that?

 A. Yes.

 Q. When Blunt [Carter] mentioned "he," did
you have an understanding as to who he
meant?

 A. Yes.

 Q. What was your understanding?

Following an overruled objection by Tom, Quezada responded that he
understood "he" to mean "Luis [Tom]."

 Carter's statement occurred during a recorded
conversation on July 24, 1998; the recording and transcript of that
conversation were admitted at trial without objection. During the
above testimony, the government was reading a portion of the
admitted transcript. Tom's objection to the admission of Quezada's
testimony regarding the statement involves two separate issues. 
First, Tom seems to be objecting to admission of Carter's
statement. Second, Tom appears to question Quezada's ability to
testify as to whom Quezada understood Carter to be referring when
he made the statement.

 We turn first to admission of Carter's statement. To the
extent that Tom is claiming that the statement itself or the
government's reading of the statement from the admitted transcript
is inadmissible hearsay, he is mistaken. First, Tom did not object
to the admission of the recording of the conversation of July 24,
1998, nor to the admission of the transcript of that tape
recording. He also did not seek a ruling regarding coconspirator
statements pursuant to Fed. R. Evid. 801(d)(2)(E) and United States
v. Petrozziello, 548 F.2d 20, 23 (1st Cir. 1977). Thus, any claim
regarding admission of the statement would be subject to plain
error review. See Woods, 210 F.3d at 78 (plain error review of
admission of coconspirator statement where appellant did not object
to omission of Petrozziello determination at close of evidence).

 Under the plain error standard, an appellant must
demonstrate that (1) there was an error; (2) the error was plain;
and (3) the error affected substantial rights. Johnson v. United
States, 520 U.S. 461, 466-67 (1997). Even once this standard is
met, an appellate court may recognize forfeited error only if "the
error 'seriously affect[ed] the fairness, integrity or public
reputation of judicial proceedings.'" Id. (quoting United States
v. Olano, 507 U.S. 725, 733-34 (1993)).

 A statement is not hearsay and is therefore admissible if
it is offered against a party and is made "by a coconspirator of a
party during the course and in furtherance of the conspiracy." 
Fed. R. Evid. 801(d)(2)(E). A statement is admissible under Rule
801(d)(2)(E) where the government demonstrates "by a preponderance
of the evidence that a conspiracy existed, that the declarant and
the defendant were members of it at the time that the declaration
was made, and that the declaration was in furtherance of the
conspiracy." United States v. Ciampaglia, 628 F.2d 632, 638 (1st
Cir. 1980). A statement is in furtherance of the conspiracy if it
"tends to advance the objects of the conspiracy as opposed to
thwarting its purpose." United States v. Flores-Rivera, 56 F.3d
319, 330 (1st Cir. 1995) (quoting United States v. Fahey, 769 F.2d
829, 839 (1st Cir. 1985)).

 We find that Carter's statement was an admissible
coconspirator statement under those standards. Carter's recorded
statement to Quezada, was during and in furtherance of the drug
conspiracy that included both Carter and Tom. Carter made the
statement immediately after handing Quezada one ounce of crack
cocaine in an attempt to alleviate Quezada's concerns about the
quality of the crack. Carter's challenged statement was intended
to reassure Quezada and convince him to proceed with the purchase,
furthering the conspiracy with Tom to distribute crack cocaine. We
need not conduct an independent inquiry into reliability when the
evidence falls within a firmly rooted hearsay exception; the
coconspirator exception to the hearsay rule is such a firmly rooted
exception. Bourjaily v. United States, 483 U.S. 171, 183 (1987). 
Thus, we hold that there was no plain error in the admission of
this coconspirator statement.

 To the extent that Tom's claim is that Quezada was not
competent to testify about his understanding of Carter's statement
-- i.e., to whom Carter was referring when he said that "he deal
with me for years" -- his claim must also be rejected. Fed. R.
Evid. Rule 701 permits opinion testimony by a lay witness where
such "opinions or inferences . . . are (a) rationally based on the
perception of the witness and (b) helpful to a clear understanding
of the witness' testimony or the determination of a fact in issue." 
See Lynch v. City of Boston, 180 F.3d 1, 16 (1st Cir. 1999); see
also United States v. Flores, 63 F.3d 1342, 1359 (5th Cir. 1995)
(allowing witness to testify to meaning of ambiguous words in tape
recorded conversation to which he was a party). The decision
regarding "[t]he admissibility of lay opinion testimony pursuant to
Rule 701 is committed to the sound discretion of the trial judge,
and the trial judge's admission of such testimony will not be
overturned unless it constitutes a clear abuse of discretion." 
United States v. Paiva, 892 F.2d 148, 156 (1st Cir. 1989).

 Here, Rule 701 would seem to permit the district court
judge to allow Quezada's clarifying testimony. Carter made his
comment while sitting in Quezada's minivan with Tom and Quezada,
shortly after handing Quezada one ounce of crack cocaine. Quezada,
as a participant in the conversation, had an opportunity to observe
Carter's body language and to pick up several nuances that jurors,
listening to the tape, might miss. Thus, while the court's ruling
could have gone either way, we conclude that the judge had
discretion to determine that the opinion was sufficiently based on
the witness' observations and sufficiently helpful to the jury to
be admitted.

 2. Agent's Vouching

 Tom argues that the district court erred when it allowed
the following exchange on redirect examination of DEA Special Agent
Pevarnik:

 Q. In fact, you were asked by [defense
counsel] if [Quezada] was truthful and
if you took steps to check his
truthfulness. Do you remember those
questions?

 A. Yes.

 Q. Did any facts come to your attention in the
course of our investigation, agent Pevarnik, to
Indicate that [Quezada] had not been truthful
with you?

After Tom's objection to the question was overruled, Pevarnik
responded "No." According to Tom, this was improper bolstering in
which the United States used its prestige to vouch for Quezada. 
Because Tom objected to the admission of Pevarnik's statement, we
review for abuse of discretion. Marino, 277 F.3d at 24.

 It is beyond dispute that the government may not use the
"prestige of the United States" to enhance the credibility of a
witness. United States v. Rosario-Díaz, 202 F.3d 54, 64 (1st Cir.
2000). "It is also undisputed that the prosecution cannot
accomplish such improper bolstering of a witness through the
testimony of other government witnesses." Id. at 65 (citing United
States v. Mazza, 792 F.2d 1210, 1214-1216 (1st Cir. 1986)).

 The government's question clearly was not intended to
elicit improper vouching for Quezada, and Pevarnik did not, in
fact, vouch for Quezada's credibility. Here, the government did
not ask Pevarnik for his personal assurances as to Quezada's
credibility. Rather, the government's question to Pevarnik was
directed at whether he had any specific evidence of Quezada's
credibility or the lack thereof; that is, whether Pevarnik had
learned of any specific facts that indicated that Quezada had not
been truthful in the past. Government witnesses "may of course
testify to facts within their personal knowledge that support or
corroborate another witness's testimony." Rosario-Díaz, 202 F.3d
at 65. Pevarnik was merely asked for facts, not opinions. Thus,
admission of the testimony was not an abuse of discretion.

 While our above ruling ends the matter, we note further
that even supposing error in admitting the testimony, it would have
been harmless. "The essential inquiry in harmless error review is
whether the improperly admitted evidence likely affected the
outcome of trial." See United States v. Rosales, 19 F.3d 763, 767
(1st Cir. 1994); see also Fed. R. Crim. P. 52(a). Here, it is
unlikely that Pevarnik's one statement about whether he had learned
any facts that made him aware whether Quezada was not truthful was
outcome determinative. The evidence against Tom was voluminous:
there were numerous recorded conversations in which Tom inculpated
himself, and the testimony of Quezada, along with corroborating
testimony by both Pevarnik and Burgos, provided ample support for
the jury's verdict. In light of the other evidence, the jury would
most likely have convicted even without Pevarnik's one comment
about Quezada's truthfulness. Thus, the district court's admission
of Pevarnik's statement was, at most, harmless error.

D. Sentencing

 Tom presents two sentencing-related issues on appeal. 
First, Tom claims the court below erred in failing to grant an
adjustment for a minor role. Second, Tom argues that the district
court erroneously failed to grant a downward departure based on
criminal history. We affirm the district court's decision on both
issues.

 1. Adjustment for Minor Role

 Tom asserts that his participation in the instant offense
qualifies as "minor," and that the sentencing Court ought to have
adjusted his offense level downward accordingly. This Court
reviews the district court's finding that a defendant is not a
minor participant only for clear error, and the defendant bears the
burden of proving that he is entitled to a downward adjustment for
his role in the offense. United States v. Meléndez, 301 F.3d 27,
33-34 (1st Cir. 2002). The determination of whether to apply the
role in the offense adjustment is very fact-specific and "rarely
reversed." United States v. Murphy, 193 F.3d 1, 8 (1st Cir. 1999). 
A district court's determination of a defendant's role in an
offense "cannot be clearly erroneous where it is based on a
reasonable inference drawn from the undisputed facts." United
States v. DiIorio, 948 F.2d 1, 5 (1st Cir. 1991).

 A downward adjustment for a defendant's minor role in the
offense is permitted for a defendant who is "substantially less
culpable than [the] average participant . . . but whose role could
not be described as minimal." U.S.S.G. § 3B1.2, app. nn. 3(A), 5. 
An analysis of the issue asks whether the defendant "is less
culpable than most others involved in the offense of conviction and
less culpable than most other miscreants convicted of comparable
crimes." United States v. Ortiz-Santiago, 211 F.3d 146, 149 (1st
Cir. 2000).

 The district court's denial of Tom's request for a minor
role in the offense adjustment was not clearly erroneous. The
evidence supports the district court's finding that Tom was not a
minor participant in the two counts on which he was convicted. 
First, the evidence showed that it was Tom who brokered the drug
transaction. Only Tom knew both Quezada and Carter, and it was Tom
who reached out for Carter to provide crack cocaine to Quezada. 
Tom was also the one who either contacted Carter or gave Quezada
the number to call. Tom ordered the crack for Quezada from Carter
and discussed the price with Carter in Quezada's presence. Second,
it was Tom who went to meet Carter while Quezada sat in his
minivan. Tom vouched for the quality of the crack cocaine, for
Carter's claim to have weighed it, and for Carter generally. 
Third, it was because of Tom that Quezada was able to purchase more
crack cocaine -- whether through Carter or through others to whom
Carter had introduced Quezada. These facts show that Tom was a
"player rather than a . . . dabbler" in the drug transaction. 
Ortiz-Santiago, 211 F.3d at 149. This Court has not found clear
error in the district courts' rejection of a minor role adjustment
in a number of cases involving analogous circumstances. See, 
e.g., United States v. Sostre, 967 F.2d 728, 732 (1st Cir. 1992)
(affirming denial of minor role adjustment where defendant "made
the initial contact with the source; communicated the amount of
drugs to be sold and its price; made all of the arrangements to
bring the buyers and sellers together; allowed his house to be used
as the situs of the drug transaction; and was present at the moment
of the transaction").

 Moreover, Tom has not shown that he was both less
culpable than the other participants in the drug conspiracy and
less culpable than most other defendants convicted of comparable
crimes. See United States v. Brandon, 17 F.3d 409, 460 (1st Cir.
1994) (affirming denial of § 3B1.2 adjustment where defendant was
less culpable than major participants, but "not less culpable than
most of the other defendants let alone substantially less culpable
than an average defendant"); United States v. Osorio, 929 F.2d 753,
764 (1st Cir. 1991) (denying mitigating role adjustment where
defendant's participation not less than average participation in
crime). Thus the district court did not err in refusing to make a
mitigating role adjustment to Tom's offense level.

 2. Departure for Criminal History Category

 At sentencing, the district court declined Tom's request
to grant a departure for an overestimated criminal history. The
Probation Department calculated six points for Tom's Criminal
History Category, which placed him in Category III under the
Sentencing Guidelines. His criminal history was based on motor
vehicle offenses, which were non-violent and not drug oriented. 
Tom argued that the classification overrepresented his criminal
history because it was based on crimes that were not drug related. 
The Court refused to depart.

 Section 4A1.3 of the Sentencing Guidelines authorizes a
reduction in a defendant's criminal history category where the
sentencing court believes that the category overstates the
seriousness of a defendant's prior convictions or his propensity to
commit future crimes. "The court of appeals has no jurisdiction,
however, to review a district court's decision not to depart
downward unless the district court misunderstood its authority to
do so." United States v. Johnstone, 251 F.3d 281, 285 (1st Cir.
2001). Thus we would only have jurisdiction if the district
court's decision "not to depart [was] based on the court's mistaken
view that it lack[ed] the legal authority to consider a departure." 
United States v. Romolo, 937 F.2d 20, 22 (1st Cir. 1991). Here, it
is apparent that the district court simply chose not to depart.

 The district court stated that it would not grant Tom's
motion for a downward departure based upon overrepresentation of
criminal history because Tom had not presented "sufficient facts"
to warrant such a departure. The district court thus clearly
"expressed that it had taken into account the arguments for a
downward departure but concluded that the assigned criminal history
category 'adequately and appropriately' represented [Tom's]
extensive criminal history." United States v. Mangos, 134 F.3d
460, 465 (1st Cir. 1998). Consequently, this Court lacks
jurisdiction to review the district court's denial of a downward
departure for criminal history.

III. Conclusion

 For the foregoing reasons, we affirm the district court's
decision.

 Affirmed.

1. In United States v. Gendron, 18 F.3d 955 (1st Cir. 1994), we
provided several examples of improper conduct rising to the level
of inducement, including where government agents:

 (1) used "intimidation" and "threats" against a
defendant's family; (2) called every day, "began
threatening" the defendant, and were belligerent; (3)
engaged in a "forceful" solicitation and "dogged"
insistence until [defendant] capitulated"; (4) played
upon defendant's sympathy for informant's common
narcotics experience and withdrawal symptoms; (5) played
upon sentiment on "one former war buddy . . . for
another" to get liquor (during prohibition); (6) used
"repeated suggestions which succeeded only when defendant
had lost his job and needed money for his family's food
and rent; (7) told defendant that she (the agent) was
suicidal and in desperate need of money.

 

Id. at 961-62 (internal citations omitted). None of these overly
coercive tactics were employed by the government in this case.
2. The relevant portions of the jury instructions were as follows:

 A person is entrapped when he is induced or
persuaded by law enforcement officers or their agents to
commit a crime that he was not otherwise ready and
willing to commit. The law forbids his conviction in
such a case. However, if the defendant was ready and
willing to violate the law and the government merely
presented him with an opportunity to do so that would not
constitute entrapment. 

 . . . .

 An entrapment offense, thus, involves two elements,
both of which must exist in order for the offense to be
valid. First, the government inducement of the defendant
to engage in criminal conduct, and second, the
defendant's lack of a predisposition to engage in the
criminal conduct prior to such inducement.

 First, in order for there to be improper inducement
there must be evidence that a law enforcement official,
or his agent, enticed the defendant to engage in criminal
activity. Neither mere solicitation or the creation of
opportunities to commit an offense constitutes
inducement. Rather inducement refers to government
conduct which persuades a person to turn from a righteous
path to an unlawful one.

 In order to rise to the level of improper inducement
the request to engage in an unlawful act must contain
pressures on the defendant to commit the crime. Pressure
can be shown by pleading with a defendant; by incessant
demands to participate in a criminal act following
repeated refusals to do so; by threats of violence or
inherently coercive tactics; or by arm-twisting aimed at
exploiting sympathy or friendship. . . .

 Second, the defendant must lack the intent or
predisposition to commit the crime prior to being
approached by government agents. When considering
whether Mr. Tom was predisposed to commit the crimes with
which he is accused you should focus on whether he was an
unwary innocent whom the law is designed to protect, or
an unwary criminal who is offered no protection by the
entrapment defense. 
3. Tom's contention that the instruction on "pressures" prevented
the jury from finding entrapment based upon a theory of persuasion
is without merit and his reliance on United States v. Montañez, 105
F.3d 36, 39-40 (1st Cir. 1997), is misplaced. In Montañez, the
court's instructions contained "examples [that] were all either
coercion examples or involved abstractions ('dogged insistence')
rather far from the examples of inducement by an undue appeal to
sympathy, which the defendant expressly requested and which were
more pertinent to his defense." Id. at 39. In contrast, the
district court here provided a more comprehensive and relevant
array of examples of the type of pressure that might create
improper inducement.